Mark D. Freeman, Esq.
PO Box 457
Media, PA  19063
(610) 828-1525                                  Attorney for Plaintiffs
_____
                                              :
C.U.                                          :
                                              :
A.R.                                          :
                                              :      UNITED STATES
                                              :      DISTRICT COURT FOR THE
          Plaintiffs                          :      EASTERN DISTRICT OF
                    v.                         :      PENNSYLVANIA
                                              :
City of Philadelphia                          :
Dept. of Human Services                       :
1515 Arch Street                              :
Philadelphia, PA 19102                        :      COMPLAINT
                                              :
Amy Crescenzo                                 :      JURY TRIAL DEMANDED
1515 Arch Street                              :
Philadelphia, PA 19102                        :
                                              :
Sharina Johnson                               :
1515 Arch Street                              :
Philadelphia, PA 19102                        :
                                              :
Laura Popma                                   :
3401 Civic Center Blvd                        :
Philadelphia, PA 19104                        :
                                              :
Shanik Hood-Haly                              :
3401 Civic Center Blvd                        :
Philadelphia, PA 19104                        :
                                              :
          Defendants                          :
_____:

Plaintiffs, C.U. and A.R. place all Defendants on notice of claims as follows:

1

**Preliminary Statement**

1.      Without ever obtaining a court order, for over two months, the Defendants banned parents from visiting/staying with their 3-month old daughter while she was experiencing life threatening illness at Children's Hospital of Philadelphia ("CHOP").

2.      In late 2020, Mother C.U. and Father A.R. were proud parents of a newborn daughter C.T.R.  Unknown to them when she was born, C.T.R. carried a genetic mutation associated with, and is currently being treated at CHOP for, Osteogenesis Imperfecta.  When plaintiff parents first sought care for then 5 week-old C.T.R. at CHOP in December of 2020, a CHOP social worker properly denied a Philadelphia Department of Human Services ("DHS") supervisor request that CHOP ban C.T.R.'s parents from CHOP because DHS did not have a court order.

3.      Two months later, when a Philadelphia DHS social worker made the same request to ban C.T.R.'s parents from CHOP, again without a court order, two CHOP social workers willfully complied with the DHS social worker's request and notified CHOP security that C.T.R.'s parents were banned from CHOP.  This parental nightmare continued for two months until DHS relented, came to their senses and permitted C.U. and A.R. back in to CHOP to be with their then five month-old daughter.

4.      Banning parents from visiting/staying with their infant daughter while she is facing life-threatening illness in the hospital without affording them due process and/or obtaining a court order egregiously violates a parent's fundamental right to the care, custody and control of their child, and violates due process and the United States Constitution.

5.     Plaintiffs C.U. and A.R. are civil rights injured parents who bring this lawsuit to prevent Philadelphia DHS employees and CHOP from inflicting this unlawful nightmare on parents who may seek care for their ill children at CHOP in the future.

**PARTIES**

6.     Plaintiff C.U. is a citizen of the United States and is a resident of City of Philadelphia in the Commonwealth of Pennsylvania.  C.U. is the natural mother and legal guardian of C.T.R.

7.     Plaintiff A.R. is a citizen of the United States and is a resident of City of Philadelphia in the Commonwealth of Pennsylvania.  A.R. is the natural father and legal guardian of C.T.R.

8.     Defendant City of Philadelphia Department of Human Services ("Philadelphia Department of Human Services", "Philadelphia DHS" or "DHS") is a municipal government entity certified/licensed by the Commonwealth of Pennsylvania's Department of Human Services as the City of Philadelphia's children and youth services agency[1], with its main office located at 1515 Arch Street, Philadelphia, PA 19102.  The City of Philadelphia Department of Human Services has a legal responsibility to operate according to the laws of the United States and the Commonwealth of Pennsylvania, including, but not limited to the United States Constitution.

9.     Defendant Amy Crescenzo ("Crescenzo") at all times relevant to this complaint was a Philadelphia Department of Human Services supervisor.   In her capacity as a DHS supervisor, Defendant Crescenzo had a legal obligation to act in

---

[1]http://services.dpw.state.pa.us/Resources/Documents/Pdf/InspectionSummary/2021012 9_13528.pdf

conformity with the U.S. Constitution, the Pennsylvania Constitution and the laws of the Commonwealth of Pennsylvania.  Defendant Crescenzo is sued in her individual capacity and is a "person" as that term is defined in 42 U.S.C. § 1983, and at all relevant times acted under the color of state law.

10.     Defendant Sharina Johnson ("Johnson") at all times relevant to this complaint was a Philadelphia Department of Human Services caseworker.   In her capacity as a DHS case worker Johnson had a legal obligation to act in conformity with the U.S. Constitution, the Pennsylvania Constitution and the laws of the Commonwealth of Pennsylvania.  Defendant Johnson is sued in her individual capacity and is a "person" as that term is defined in 42 U.S.C. § 1983, and at all relevant times acted under the color of state law.

11.     Defendant Laura Popma ("Popma") is a social worker employed by CHOP who is sued for her willful participation and joint action with Defendants Crescenzo and Johnson without any court order to ban C.U. and A.R. from CHOP for two months while their infant daughter was experiencing a life-threatening episode at CHOP.  Defendant Popma is the SCAN team social worker at CHOP.  SCAN is an acronym for Suspected Child Abuse and Neglect.

12.     Defendant Shanik Hood-Haly ("Hood-Haly") is a social worker employed by CHOP who is sued for her willful participation and joint action with Defendants Crescenzo and Johnson without any court order to ban C.U. and A.R. from CHOP for two months while their infant daughter was experiencing a life-threatening episode at CHOP.  Defendant Hood-Haly is also known as Shanik Hood.

**JURISDICTION AND VENUE**

13.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

and 28 U.S.C. §§ 1343(a)(3) and (4).  Declaratory relief is authorized by 28 U.S.C. §

2201 and Federal Rule of Civil Procedure 57.

14.     This court has personal jurisdiction over the Defendants, who are located

in the Eastern District of Pennsylvania.

15.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28

U.S.C. § 1391(a) in that Defendants are subject to personal jurisdiction within the

Eastern District of Pennsylvania and the events that give rise to this action occurred

within the Eastern District of Pennsylvania.

**FACTS**

**Pennsylvania Policy Regarding
Due Process Anytime a Parent's Rights are Altered**

16.     Prior to 2014, Pennsylvania county child protection agencies such as

Philadelphia DHS routinely impaired parents' right to the care custody and control of

their children without affording them procedural due process of law as required by the

Fourteenth amendment of the United States Constitution.

17.     Procedural due process includes providing the parents with notice of the

allegations leading to the impairment of their parental rights and an opportunity at some

point for the parents' defend themselves in front of a neutral tribunal.   The county

agency typically obtains an *ex parte* court order granting the county agency temporary

emergency custody of the child after which parents are afforded due process to defend the allegations that led to the *ex parte* request for custody.

18.     In 2014, the Commonwealth of Pennsylvania's then named Department of Public Welfare (now called the Department of Human Services) issued a "SPECIAL TRANSMITTAL" to all county children and youth service agencies, including Philadelphia DHS, concerning due process protections to be afforded to parents.

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF PUBLIC WELFARE**

JUN 1 6 2014

**SPECIAL TRANSMITTAL**

**SUBJECT:**     Safety Planning and Due Process Protections

**TO:**     County Children and Youth Social Service Agencies
Private Children and Youth Social Service Agencies
County Children and Youth Solicitors

**FROM:**     Cathy A. Utz
Acting Deputy Secretary for Children, Youth and Families

19.     Citing Third Circuit precedent, and a Middle District of Pennsylvania opinion, the Department of Public Welfare's Special Transmittal states, "Specifically, procedural due process 'requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right' to the care, custody and management of his or her children", "any time a separation occurs within the family", including "any altering of parental capacity", "separation of a parent from a child", removal of a parent", "interference with custody", and "interference with parental visitation".

6

<u>**The following sections focus on providing considerations to assist in ensuring the Due Process Rights of Parents**</u>

**Legal Background of Due Process Cases**

Recent cases have stressed that parents have certain legal rights which must be protected, including an opportunity to be heard within a reasonable time period when parental rights have been impacted. Specifically, procedural due process "requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right" to the care, custody, and management of his or her children. *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003) (emphasis added); *see also Isbell v. Bellino*, 2013 WL 4516475 (M. D. Penn). Due process is required any time a separation occurs within the family and in other situations in which a deprivation of rights occurs, including, but not limited to:

- Any altering of parental capacity;
- Separation of a parent from a child;
  - o Removal of a parent;
  - o Removal of a child;
- Interference with custody;
- Interference with decision making authority;
- Interference with parental visitation, such as limiting unsupervised contact with a child.

## C.T.R.'s Admission to CHOP

20.     C.T.R. was born a few weeks premature, stayed in the NICU for about one day and was discharged after three days in the hospital.

21.     C.T.R.'s first few weeks of life included several pediatrician visits and formula changes for reflux.

22.     On the morning of December 10, 2020, C.T.R. was five weeks old when C.U. and A.R. noticed C.T.R.'s body temperature was cool and she was unresponsive.

23.     C.U. and A.R. immediately called C.T.R.'s pediatrician and then rushed C.T.R. to CHOP.

24.     At CHOP, brain imaging revealed C.T.R.'s brain was subjected to a "progressive destructive process, possibly infectious or metabolic in origin…These findings are not typical of direct traumatic brain injury."

25.     C.T.R.'s brain destruction from an infectious or metabolic process explained her unresponsiveness and inability to maintain her body temperature.

26.     Due to C.T.R.'s unstable condition, CHOP was unable to test her spinal fluid to confirm an infectious cause of her brain destruction.

27.     C.T.R. was treated with antibiotics as if she did have an infection that caused her brain destruction.

28.     In addition to brain destruction from a likely infectious process, imaging incidentally revealed C.T.R. had healing and acute rib fractures and a possible healing clavicle fracture.

29.     C.U. and A.R. could not provide any "explanation" for C.T.R.'s fractures.

30.     The prevailing opinion at CHOP in December of 2020, was that C.T.R.'s brain findings were likely infectious, but that her "unexplained" fractures were "suspicious" and presumed to have been abusively inflicted.

**Osteogenesis Imperfecta**

31.     "Osteogenesis Imperfecta is a group of genetic disorders that mainly affect the development of the bones.  People with this condition have bones that break easily, often from little or no trauma."[2]

---

[2] https://rarediseases.info.nih.gov/diseases/1017/osteogenesis-imperfecta

32.     Infants with Osteogenesis Imperfecta are known to sustain fractures from ordinary infant handling such as changing diapers and burping an infant.[3]

33.     The Osteogenesis Imperfecta Foundation cautions that when parents of a child with Osteogenesis Imperfecta bring their child to the hospital with unexplained fractures, "OI [Osteogenesis Imperfecta] is often mistaken for child abuse"[4] just as occurred in this case.

34.     The Osteogenesis Imperfecta Foundation further informs, "In its mildest form, OI may exhibit only as unexplained bone fractures in childhood."[5]

**Defendant Crescenzo's unsuccessful attempt
to ban C.U. and A.R. from CHOP without a court order**

35.     Assuming C.T.R.'s fractures were abusively inflicted, on December 12, 2020, Defendant Crescenzo called CHOP social worker Thaddeus Desmond asking, "if CHOP could restrict parents" from visiting C.T.R. at the hospital.

36.     CHOP social worker Desmond asked if Defendant Crescenzo already had or intended to obtain a court order for emergency protective custody of C.T.R.

37.     Defendant Crescenzo responded that she did not have a court order and she did not intend to obtain a court order because C.T.R. was so ill it was believed C.T.R. might die.

---

[3] Osteogenesis Imperfecta Foundation.  Child Abuse or Osteogenesis Imperfecta? "Fractures may occur from ordinary activities, such as changing a diaper or burping a baby… There may be no obvious indication that a fracture has occurred" https://oif.org/wp-content/uploads/2019/08/Child_Abuse__Child_Abuse_or_Ostegenesis_Imperfecta.pdf
[4] id.
[5] id.

38.     After consulting with a superior, CHOP social worker Desmond notified

Defendant Crescenzo that CHOP would not ban parents from visiting C.T.R. at CHOP

"at this time" without a court order.

> **TODAY'S DATE:** 12/11/2020
> **TODAY'S TIME:** 11:42 PM
>
> Patient and family screened today for Social Work needs.
>     Suspected abuse/neglect
>
> Additional Comments: On-call SW received call from DHS supervisor Amy Crescenzo (215-███████) asking if
> CHOP could restrict parents from visiting patient. SW asked if they had court order/emergency custody asking
> for that? Worker explained that they did not and were not seeking custody at this time due to possible future
> passing of patient. SW consulted LOC (Megan Bowers) and decision was made to not restrict at this time
> without court order. SW attempted to call Ms. Crescenzo back to inform her of this decision but she did not
> answer. Left VM asking for a return phone call.

(S.W. note from CHOP medical records)

39.     C.U. and A.R. visited and stayed with C.T.R. and advocated for her care

while C.T.R. was admitted to CHOP, as any loving parents would do for their critically ill

child.

40.     C.T.R.'s condition gradually stabilized, though she continued to

experience significant medical challenges.

41.     C.U. and A.R. were intimately involved in parental decision making for

C.T.R.'s health and advocating for C.T.R.'s care while C.T.R. was admitted to CHOP.


**CHOP's "negative" genetic testing of C.T.R. and C.U.
actually revealed that both had
a genetic mutation associated with Osteogenesis Imperfecta.**

42.     On December 16, 2020, CHOP conducted genetic testing for

Osteogenesis Imperfecta on C.T.R.

43.     C.T.R.'s mother, C.U., had several clinical symptoms indicating a possible

bone disorder such as Osteogenesis Imperfecta.

10

44.     Because of C.U.'s medical history that raised suspicion she might have Osteogenesis Imperfecta, CHOP also ran genetic panel testing for Osteogenesis Imperfecta on C.U.

45.     CHOP doctors told C.U. and A.R. that both C.T.R.'s and C.U.'s "Osteogenesis Imperfecta panel was negative".

46.     What CHOP doctors did not inform C.U. and A.R., as detailed more fully below, was that C.T.R.'s and C.U.'s CHOP Osteogenesis Imperfecta Panel testing revealed they both had a gene mutation associated with Osteogenesis Imperfecta, FKBP10.[6]


**CHOP medical staff causes
new right femur fracture at the hospital
while C.U. and A.R. were not present at CHOP.**

47.     C.T.R. remained at CHOP throughout the rest of December of 2020, January of 2021 and the beginning of February of 2021.

48.     On the afternoon of February 10, 2021, C.U. and A.R. left CHOP to take a break from the hospital and visit with their older daughter who was being cared for by grandparents.

49.     While C.U. and A.R. were absent from CHOP during the afternoon/evening of February 10, 2020 and the morning of February 11, 2020, members of CHOP's medical staff conducted at least six medical checks on C.T.R.

---

[6] Steinlein et al., Mutations in FKBP10 can cause severe form of isolated Osteogenesis imperfecta, BMC MedGenet. 2011, doi:10.1186/1471-2350-12-152. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3270005/#:~:text=Mutations%20in%20the%20FKBP10%20gene%20were%20first%20described,disorder%20characterized%20by%20congenital%20contractures%20and%20bone%20fragility.

50.     These medical checks included CHOP medical personnel placing a blood pressure cuff on C.T.R.'s right leg at least twice, one at 11:29 pm on February 10th and 4:49 am on February 11th.

51.     It is also possible CHOP medical personnel placed a blood pressure cuff a third time on C.T.R.'s right leg at 4:14 pm on February 10th as well.

| Date/Time | Temp | Temperature Source | Pulse | Resp | BP | Cuff Location | SpO2 | ETCO2 (mm Hg) | Who |
|---|---|---|---|---|---|---|---|---|---|
| 02/11/21 1240 | 97.2 °F (36.2 °C) ! | Axillary | 116 | 48 | 97/39 | LLE | 98 % | -- | HD |
| 02/11/21 0800 | 97.5 °F (36.4 °C) | Axillary | 128 | 44 | 86/39 | LLE | 95 % | -- | HD |
| 02/11/21 0449 | 98.1 °F (36.7 °C) | Axillary | 135 | 44 | 96/42 | RLE | 98 % | -- | NM |
| 02/10/21 2329 | 97.9 °F (36.6 °C) | Axillary | 146 | 44 | 96/47 | RLE | 99 % | -- | NM |
| 02/10/21 2043 | 97.9 °F (36.6 °C) | Axillary | 175 ! | 36 | 93/46 | LLE | 100 % | -- | NM |
| 02/10/21 1614 | 97.5 °F (36.4 °C) | Axillary | 169 ! | 32 | 94/56 | -- | 100 % | -- | TMW |
| 02/10/21 1300 | 97.3 °F (36.3 °C) ! | Axillary | 134 | 36 | 85/41 | RLE | 100 % | -- | TMW |
| 02/10/21 0926 | -- | -- | 137 | -- | -- | -- | -- | -- | TMW |
| 02/10/21 0840 | -- | -- | -- | -- | 107/53 | RLE | -- | -- | TMW |

(From CHOP medical records)

52.     No abnormalities were noted on C.T.R.'s right leg until later in the morning on February 11, 2020.

53.     On February 11, 2020 at 10:00 am, a CHOP nurse noticed C.T.R.'s right leg was swollen and immediately notified a doctor.

Progress Notes by Dunleavy, Hope, RN at 2/11/2021 10:30 AM (continued)

| | | |
|---|---|---|
| Author: Dunleavy, Hope, RN | Service: — | Author Type: Registered Nurse |
| Filed: 2/11/2021 8:53 PM | Date of Service: 2/11/2021 10:30 AM | Status: Signed |
| Editor: Dunleavy, Hope, RN (Registered Nurse) | | |

Pt was resting comfortably asleep in mamaroo this am. This RN moved patient to bed for nursing care and to change diaper at 10am, when noted RLE was swollen and firm area was noted below R knee. Circumferences taken RLE>LLE, charge RN called to beside, MD notified.

(Nurse note from CHOP medical records)

54.     When the CHOP doctor called C.U. and A.R. to report the new fracture,

C.U. expressed concern that C.T.R. might have a bone abnormality that CHOP had

failed to identify – that "something was wrong" with C.T.R. that had not yet been

identified by CHOP.

> Pamela A Mazzeo, MD, 2/11/2021
>
> Attending addendum 2/11/2021 6:02 PM
> I spoke with C████'s parents by phone this afternoon to update them about the new finding of femur fracture. Mom was tearful upon answering the phone (prior to learning of the fracture) and throughout our conversation. I informed her that the swelling was noted this morning and that we ordered x-ray in response, which revealed an apparently acute femur fracture. Parents were distressed by the news and asked how this could have happened in the hospital. Mom expressed conviction that "something is wrong" with C████ that we have not yet identified. She expressed concern that C████ has a bone health abnormality, citing low-calcium formula. Parents requested that C████ be placed on 24-hour 1:1 observation; I told them I would ask about this but could not guarantee it would be available. I informed them that we would be talking to radiology to help determine the etiology of the fracture and would also be re-engaging orthopedics, SCAN, and bone health, to ascertain whether there is any additional work-up required. Parents requested that we speak again in person tomorrow at 1pm and we agreed that it would be helpful to include SW and nursing leadership in the discussion.

(Doctor note from CHOP medical records)

55.     On February 11, 2021, a CHOP doctor ordered that medical personnel

follow fragile bone precautions when caring for C.T.R.

56.     C.T.R.'S fragile bone precautions continued for three months until C.T.R.'s

discharge from CHOP on May 7, 2021.

| Nursing Order: please follow Fragile Bone precautions [174270168] | |
|---|---|
| Electronically signed by: **Porcari, Giulia S, MD on 02/11/21 1614** | Status: **Discontinued** |
| Ordering user: Porcari, Giulia S, MD 02/11/21 1614 | Ordering provider: Porcari, Giulia S, MD |
| Authorized by: Porcari, Giulia S, MD | Ordering mode: Standard |
| Class: Hospital Performed | Quantity: 1 |
| Instance released by: Porcari, Giulia S, MD (auto-released) 2/11/2021  4:14 PM | Discontinued by: Discharge Provider, Automatic, MD 05/07/21 2013 [Patient discharged] |
| Order comments: Nursing Order: please follow Fragile Bone precautions | |

57.     A sign indicating fragile bone precautions had been instituted was placed

on C.T.R.'s hospital bed.



58. On February 12, 2020, SCAN team social worker Defendant Popma reported the new femur fracture, and additional new rib and foot fractures, that were discovered as well, to Philadelphia DHS as suspected abuse.

Progress Notes by Popma, Laura, MSW at 2/12/2021 2:31 PM

| | | |
|---|---|---|
| Author: **Popma, Laura, MSW** | Service: **SCAN-Child Protection** | Author Type: **Social Worker** |
| Filed: 2/12/2021 2:42 PM | Date of Service: 2/12/2021 2:31 PM | Status: **Signed** |
| Editor: **Popma, Laura, MSW (Social Worker)** | | |

**Report of Suspected Child Abuse and Neglect**

...

On 2/11/2021, a nurse noted swelling of the right thigh which prompted an x-ray which revealed a right femur fracture without evidence of healing. Skeletal survey obtained on 2/12/2021 remonstrated the right femur fracture and revealed a fracture of the left foot without evidence of healing and multiple rib fractures without evidence of healing. These fracture have not been previously identified and are considered new. At this time, there are no known accidents or events that would have led to these fractures. Mother and Father expressed concern for CHOP staff causing patient's injuries due to patient being admitted at CHOP when injuries occurred. At this time, a report to Child Protective Services is warranted to further investigate the cause of pt's injuries. Medical work up is also ongoing to further evaluate.

(S.W. note from CHOP medical records)

**DHS Defendants' second, and this time successful,
attempt to ban C.U. and A.R. from CHOP
without a court order or due process**

59.     After speaking with DHS case worker Defendant Johnson on February 12,

2020, Defendant Popma called Defendant Hood-Haly requesting that C.U. and A.R. be

banned from the hospital and prevented from visiting or staying with C.T.R.

60.     Defendant Popma is the Suspected Child Abuse and Neglect ("SCAN")

team social worker at CHOP.

61.     Neither Defendant Popma nor Defendant Hood-Haly asked whether

Philadelphia DHS had obtained or intended to obtain a court order, consulted with a

superior or asked if Defendant Hood-Haly intended to afford parents due process.

62.     Defendant Hood-Haly "implemented the restriction and distributed to unit

clerk and security" thus banning C.U. and A.R. from CHOP where their then three

month-old daughter C.T.R. was continuing to struggle with serious life-threatening

illness alone without her parents at her side.

> Progress Notes by Hood, Shanik at 2/12/2021 9:31 PM (continued)
> **PATIENT NAME:** C█████ T█████ R█████
> **CHOP MRN#:** 56572390
> **DOB:** ██/2020
> **TODAY'S DATE:** 2/12/2021
> **TODAY'S TIME:** 9:31 PM
>
> **Problems:**
> Visitation restrictions
>
> **Progress:** Resolved
>
> **Plan:** On-call SW received a call from SCAN SW requesting that parents (C█████ U█████ & A█████ R█████)
> be restricted from the hospital at the request of DHS worker (Sharina Johnson) due to ongoing investigation.
> On-call SW implemented the restriction and distributed to unit clerk and security. SW will remain available as
> needed throughout hospital stay.

(S.W. note from CHOP medical records)

63.     Defendants Johnson and Crescenzo both informed     C.U. and A.R. that

they were banned from visiting/staying with C.T.R. at CHOP.

**C.T.R.'s new femur fracture caused by hospital staff
provokes second genetic panel testing for Osteogenesis Imperfecta,
this time with a genetic lab outside of CHOP**

64.    On February 19, 2021, CHOP's genetics department decided to test

C.T.R. again for Osteogenesis Imperfecta, this time with an outside genetics laboratory

because the CHOP Osteogenesis Imperfecta genetics panel had limitations that would

fail to detect certain genetic mutations known to cause Osteogenesis Imperfecta.

> Since C▓▓▓▓ sustained two more fractures while being admitted to CHOP, it is worthwhile to send a comprehensive targeted OI gene panel. While sequence changes/variants in those genes would have been detected on exome sequencing, exon-level deletions/duplications cannot be detected by the CHOP exome. These exon-level del/dups represent very rare mutational mechanisms, but should be ruled out to complete the work-up, even though, as outlined above in Dr. Strong's PE (and prior evaluations), C▓▓▓▓ does not have the other signs or findings for OI.
>
> PLAN:
> *   Comprehensive OI gene panel - send-out to CTGT:
>     *   seq & **del/dup** of the following genes: *ALPL, ANO5, BMP1, COL1A1, COL1A2, CREB3L1, CRTAP, FKBP10, IFITM5, LRP5, MBTPS2, P3H1, P4HB, PLOD2, PLS3, PPIB, SEC24D, SERPINF1, SERPINH1, SP7, SPARC, TAPT1, TMEM38B, WNT1, XYLT2*
>     *   Order pended; completed CTGT lab req placed in her Media tab
> The above plan was reviewed with her primary team and other consultants.
>
> *Livije filou*
>
> Livija Medne, MS, CGC
> Sr.Genetic Counselor
> Roberts IMGC, Division of Human Genetics
> The Children's Hospital of Philadelphia
>
> Electronically signed by Strong, Alanna, MD on 2/20/2021 7:19 AM

(Genetic note from CHOP medical records)

**Defendant Crescenzo insisted that she supervise C.U. and A.R.
on the one day in two months
that she permitted C.U. and A.R. into CHOP**

65.    During the two months C.U. and A.R. were banned from seeing their

daughter C.T.R. while she was at CHOP, C.U. and A.R. were permitted to be at CHOP

on only one single day.

66.    On February 24, 2021, due to C.T.R.'s critical medical condition, CHOP

neurosurgeons surgically installed a shunt to help remove fluid that was accumulating in

C.T.R.'s brain.

67.     Upon the pleading of C.U. and A.R., Defendant Crescenzo permitted C.U. and A.R. to come to CHOP to be with their then 4 month-old daughter C.T.R. on that one day of C.T.R.'s neurosurgery.

68.     However, Defendant Crescenzo insisted that she supervise C.U. and A.R. the entire time they were present at CHOP.

---

**Progress Notes by Popma, Laura, MSW at 2/22/2021 11:10 AM (continued)**
**TODAY'S TIME:** 11:10 AM

Social work continues to follow this patient.

Additional Comments: Child Protection Team SW spoke to DHS Supervisor: Amy Crescenzo (cell: 215-█████-████) and Ms. Crescenzo confirmed that she will come to CHOP on Wednesday (2/24/21) at 6:30AM to supervise Mother and Father throughout the day due to pt going to the OR for a VP shunt.

(S.W. note from CHOP medical records)

**New fractures discovered after C.U. and A.R. were banned from CHOP**

69.     On March 3, 2020, three weeks after C.U. and A.R. had been banned from visiting C.T.R. at CHOP, new arm and leg fractures were discovered on C.T.R.

70.     A CHOP Orthopedics progress note states, "These new fractures were not seen on the skeletal survey completed on 2/12."

---

**Progress Notes by Lawrence, John T, MD at 3/3/2021  6:23 PM**
Author: Lawrence, John T, MD          Service: Orthopedics          Author Type: **Physician**
Filed: 3/13/2021  6:07 PM          Date of Service: 3/3/2021  6:23 PM          Status: Addendum
Editor: Lawrence, John T, MD (Physician)
Related Notes: Original Note by Zhang, Steven, MD (Resident) filed at 3/3/2021  6:42 PM

Orthopedics was called about findings of L distal tibia buckle fx and L distal humerus buckle fx seen on skeletal survey completed today 3/3. This is in the setting of encephalomalacia/encephaloclastic process, seizures, and prior known rib fx, R femur fx and L 1st MT fx. These new fractures were not seen on the skeletal survey completed on 2/12 . Per discussion with the primary team, patient has not been exposed to further any known trauma or injuries during this admission since December. Parent visits have been under supervision.

71.     On March 3, 2021, the CHOP radiologist reported these were new fractures that were not seen on the previous imaging.

This study has been reviewed by a second attending pediatric
radiologist, Dr. Francavilla, who is in agreement with the
interpretation.

Impression:

1.  New fractures are present at the left distal humerus and
possible fractures of the left distal tibia and fibula. Recommend
dedicated radiographs of the sites.
2.  Bilateral healing rib fractures please see above for details.
Distal right femur and left first metatarsal fractures again
noted.
3.  Diffuse demineralization.

(Radiology report from CHOP medical records)

**Genetic testing sent to outside lab reveals C.T.R. has a genetic mutation
associated with Osteogenesis Imperfecta resulting
in uncertainty about CHOP's assumption
that C.T.R.'s fractures had been abusively inflicted.**

72.     On April 1, 2020, CHOP received the results from C.T.R.'s outside lab

Osteogenesis Imperfecta genetic panel testing.

73.     The outside lab identified that C.T.R. and C.U. both had    one copy of a

genetic FKBP10 mutation associated with Osteogenesis Imperfecta.

74.     C.U. asked the CHOP genetics department about whether CHOP's

December 16, 2020 Osteogenesis Imperfecta genetic panel testing had noted whether

C.T.R. and/or C.U. had the FKBP10 mutation.

75.     In response, the genetics doctor confirmed that, though C.U. was told the

CHOP December Osteogenesis Imperfecta panel testing results were "negative", the

testing had in fact identified the FKBP10 mutations in both C.T.R. and C.U.

76.     Though the FKBP10 mutation is typically a recessive trait requiring a

patient to have two FKBP10 mutated genes in order to experience symptoms of

disease, in some cases, either the testing methods themselves are not sensitive or

accurate enough to detect the second FKBP10 mutation, or, in rare cases, a patient can

18

exhibit the symptoms of Osteogenesis Imperfecta with just one mutated copy of the FKBP10 gene.

77.     CHOP's discovery that both C.T.R. and C.U. had the FKBP10 mutation that is associated with Osteogenesis Imperfecta confirmed what C.U. had insisted since C.T.R.'s admission to CHOP, and should have been obvious to any reasonable person due to C.T.R.'s continued bone fracturing while in the hospital - there was something wrong with C.T.R. that CHOP had failed to discover.

78.     It is well-recognized in the medical community that cognitive biases, such as confirmation bias and overconfidence[7], can lead to misdiagnosis.

79.     These well-recognized cognitive biases made it difficult for those CHOP doctors who had incorrectly concluded that C.T.R.'s fractures had been abusively inflicted to change their minds.

80.     However, CHOP doctors, though they still had a "high concern" for abuse, ultimately, and begrudgingly, conceded that it was not possible to continue assume that

---

[7] Sullivan ED, Schofield SJ , *Cognitive bias in clinical medicine*, J R Coll Physicians Edinb 2018; 48: 225–232  |  doi: 10.4997/JRCPE.2018.306
https://journals.sagepub.com/doi/epdf/10.4997/jrcpe.2018.306
"Cognitive bias is increasingly recognized as an important source of medical error, and is both ubiquitous across clinical practice yet incompletely understood." see also, Saposnik et al., *Cognitive biases associated with medical decisions: a systematic review*, BMC Med Inform Decis Mak., 2016; 16: 138, doi; 10.1186/s12911-016-0377-1
"As shown, cognitive biases and personality traits may affect our clinical reasoning processes which may lead to errors in the diagnosis, management, or treatment of medical conditions."
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5093937/pdf/12911_2016_Article_377.pdf

C.T.R.'s fractures were due to abuse simply because C.U. and A.R. could not "explain" how they occurred.

> In summary, there remains high concern for the diagnosis of inflicted trauma as the cause of C████'s injuries at the time of presentation, however, given the complexities of her presentation and subsequent hospital course, it is not possible to identify the cause of her findings definitively at this time.

(Progress note in CHOP medical records)

81.     Any residual concern, even a "high concern", that C.T.R. had been abused is a remnant of well-recognized medical cognitive biases and the basic aspect of human nature that makes it difficult for anyone to admit they were wrong.

82.     "High concern" is a state of mind, not medical evidence.

83.     The medical evidence in this case is that C.T.R. presented with a significant brain insult likely due to an infection and C.T.R.'s "unexplained" fractures were only discovered incidentally.  "Unexplained" fractures are a frequent presentation in children with Osteogenesis Imperfecta, and often leads to false allegations of child abuse.   C.T.R. continued to fracture while she was admitted to the hospital, even after C.U. and A.R. were banned from the hospital.  Genetic testing revealed that C.T.R. inherited one FKBP10 mutation from her mother C.U.  While one FKBP10 mutation normally doesn't cause bone problems, in some cases, either due to the limitations of the genetic testing to detect mutations, or, in rare cases, patients with one FKBP10 mutation do have Osteogenesis Imperfecta.  In either case, the initial assumption that C.T.R.'s fractures were abusively inflicted because her parents could not "explain" them turned out to be proven wrong by the medical evidence.

**Defendant Crescenzo lifts the ban**

84.     On April 22, 2021, Defendant Crescenzo called the CHOP social worker and lifted the ban on C.U. and A.R. at CHOP.

> **Progress:  SW received call from CYS supr, Amy Crescenzo (215-█████). Current plan for discharge is to train parents in preparation for discharge home with them; DHS will work on a safety plan including supervision.**
> **SW spoke with pt's mother to inform her that Visitor Restriction will be lifted. They plan to come to bedside this afternoon and would like any information re: teaching, etc.**

  (Progress note in CHOP medical records)

85.     C.U. and A.R. immediately rushed into CHOP to be with their infant daughter C.T.R.

86.     The unlawful ban imposed by Defendants Crescenzo and Johnson, willingly aided and assisted by Defendants Popma and Hood-Haly, lasted a total of 68 days.

87.     On May 7, 2021, C.T.R. was discharged from CHOP into the care of her loving parents, C.U. and A.R.

88.     C.T.R. continues to suffer, and C.U. and A.R. continue to manage as best they can, the effects of C.T.R.'s likely infectious origin brain insult and the deleterious impact C.T.R.'s Osteogenesis Imperfecta has on her bones.

89.     Today, C.T.R. receives continuing treatment for her neurological problems and her Osteogenesis Imperfecta at CHOP.

90.     From February 12, 2021 through April 22, 2021, for 68 days, while their infant daughter C.T.R. was in critical medical condition at CHOP, the Defendants, without obtaining or requiring a court order, banned C.U. and A.R. from visiting and staying with their daughter causing C.U. and A.R. severe emotional distress.

21

**Procedural due process violation**

91.     Pursuant to the United States Constitution, "it has long been established … that the Fourteenth Amendment 'requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right' to the care, custody and management of his children." *Isbell v. Bellino*, 962 F. Supp. 2d 738 (M.D. Pa. 2013).

92.     When Defendants Crescenzo, Johnson, Popma and Hood-Haly all willfully participated and jointly acted to ban C.U. and A.R. from visiting/staying with their 3 month-old daughter at CHOP, the Defendants *altered* C.U.'s and A.R.'s fundamental right to the care custody and control of C.T.R..

93.     Banning C.U. and A.R. from visiting/staying with C.T.R. at CHOP without obtaining a court order denied C.U. and A.R. procedural due process in which they would be afforded the opportunity to challenge, before a neutral court, the Defendants' unilateral imposition of a ban on C.U. and A.R. from visiting/staying with C.T.R.

**Substantive due process violation**

94.     Without an objectively reasonable basis, the Defendants' banning C.U. and A.R. from CHOP constitutes an unreasonable government intrusion, an arbitrary abuse of government power and a substantive due process violation[8].

---

[8] *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123 (3rd Cir. 1997) "Our focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the Crofts' rights as Chynna's parents. Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power."

95.     C.U. and A.R. were banned from CHOP the day after C.T.R. sustained a femur fracture while C.T.R. was in the care of CHOP medical personnel.

96.     C.T.R.'s femur fracture occurred when C.U. and A.R. were not even present at CHOP.

97.     Banning C.U. and A.R. from CHOP after C.T.R. sustained a femur fracture that neither C.U. nor A.R. could have possibly caused, was an unreasonable exercise of government power and violated C.U.'s and A.R.'s right to substantive due process.


**Philadelphia DHS' failure to train
it's employees, supervisors and administrators
about parents' due process rights**

98.     Upon Information and belief, Philadelphia County is a member of the County Commissioners Association of Pennsylvania.

99.     The Pennsylvania Children and Youth Administrators Association is an Affiliate of the County Commissioners Association of Pennsylvania.

100.    Upon information and belief, Defendant Philadelphia DHS is a member of the Children and Youth Administrators Association.  The Pennsylvania Children and Youth Administrators Association (PCYA) is a 501(c) (4) nonprofit corporation incorporated in 1969. The Association represents all sixty-seven county children and youth agencies in activities with other organizations and government officials and facilitates on-going networking and information sharing among its membership.

101.    The Children and Youth Administrators Association has delegated its responsibility to train its member county employees, supervisors and administrators to the University of Pittsburgh's Pennsylvania Child Welfare Training Program.[9]

102.    Defendant Philadelphia DHS delegated its duty to train its caseworkers, supervisors and administrators to the University of Pittsburgh's Pennsylvania Child Welfare Training Program.

103.    A review of the materials used by Defendant Philadelphia DHS' to train its case-workers, supervisors and administrators, demonstrates it is devoid of training that banning parents from visiting/staying with their child in the hospital alters the parents' fundamental right to the care, custody and control of their child, and triggers due process considerations.

**CLAIMS**

104.    C.U.'s and A.R.'s claims against the Defendants include the following:

---

[9] "The Pennsylvania Child Welfare Training Program (Training Program) is a collaborative effort of the University of Pittsburgh, School of Social Work, the Pennsylvania Department of Public Welfare, and the Pennsylvania Children and Youth Administrators. It was established to train direct service workers, supervisors, administrators, and foster parents in providing social services to abused and neglected children and their families. The Training Program is centrally managed and regionally administered by the University of Pittsburgh, School of Social Work." https://www.pacwrc.pitt.edu/AboutUs.htm

**CLAIM I**
**Due process violation**
**by Philadelphia Department of Human Services**

105.    In addition to the Third Circuit's 1997 Croft v. Westmoreland County

decision providing notice[10], the Commonwealth of Pennsylvania Department of Public

Welfare's June 16, 2014 Special Transmittal to all county agencies informed the

Philadelphia Department of Human Services that "procedural due process 'requires

rigorous adherence to procedural safeguards anytime the state seeks to *alter*,

terminate, or suspend a parent's right' to the care, custody and management of his or

her children."

106.    Philadelphia DHS failed to train its direct service workers, supervisors and

administrators that banning parents from visiting/staying with their child in the hospital

alters the parents' fundamental right to the care, custody and control of their child, and

triggers due process protections.

107.    On two separate occasions, Philadelphia DHS employees, Defendants

Crescenzo and/or Johnson requested that CHOP ban C.U. and A.R. from

visiting/staying with their infant daughter C.T.R. at CHOP without already having or

intending to obtain an *ex parte* court order for emergency protective custody of C.T.R.

108.    Defendant Crescenzo demonstrated her approval of the ban without a

court order or affording C.U. and A.R.  due process when she insisted that she

supervise C.U.'s and A.R.'s presence at CHOP "throughout the day" on February 24,

---

[10] "The Due Process Clause of the Fourteenth Amendment prohibits the government
from interfering in familial relationships unless the government adheres to the
requirements of procedural and substantive due process." *Croft v. Westmoreland
County Children and Youth Services*, 103 F.3d 1123 (3rd Cir. 1997)

2021 when C.T.R. underwent neurosurgery to install a shunt to drain fluid that was accumulating on C.T.R.'s brain.

109.    These actions by Philadelphia DHS employees lead to a reasonable inference that either Philadelphia DHS has a policy that allows DHS employees to make such requests without affording parents due process and obtaining a court order, and/or Philadelphia DHS fails to adequately train its employees that "procedural due process 'requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right' to the care, custody and management of his or her children."

110.    Philadelphia DHS's policy and/or failure to train its employees about due process when requesting that parents be banned without a court order from the hospital where their child is being cared for resulted in an unlawful two-month separation from their daughter C.T.R. that violated C.U.'s and A.R.'s right to due process.

## CLAIM II
## Due process violations by Defendants Crescenzo and Johnson

111.    On February 10 or 11, 2021, C.T.R.'s femur was fractured while in the care of CHOP personnel while C.U. and A.R. were not present at CHOP.

112.    A reasonable person would not believe or assume that C.U. or A.R. had anything to do with C.T.R.'s femur fracture.

113.    A reasonable person would believe that if C.T.R.'s femur can be fractured by medical personnel providing medical care in the hospital, the assumption that

C.T.R.'s previous fractures were abusively inflicted because C.U. and A.R. could not "explain" them, was no longer a valid assumption.

114.    Instead, Defendants Crescenzo and Johnson, unreasonably imputed blame for C.T.R.'s femur fracture onto C.U. and A.R.

115.    As a result, Defendant Johnson requested that CHOP ban C.U. and A.R. from visiting/staying with their infant daughter C.T.R. at CHOP without already having or intending to obtain an *ex parte* court order for emergency protective custody of C.T.R.

116.    Defendant Crescenzo's approval of Defendant Johnson's request is evidenced by Defendant Crescenzo's insistence that Defendant Crescenzo supervise C.U. and A.R. on the one single day C.U. and A.R. were permitted to be at CHOP during the ban, on February 24, 2021 when C.T.R. underwent neurosurgery.

117.    No reasonable basis existed to ban C.U. and A.R. from CHOP after C.T.R. suffered a femur fracture when C.U. and A.R. were not present at CHOP.

118.    Defendants Crescenzo and Johnson denied C.U. and A.R. substantive due process when they banned them from CHOP with no reasonable basis to do so.

119.    Defendants Crescenzo and Johnson denied C.U. and A.R. procedural due process to challenge the ban when they failed to initiate due process by obtaining an emergency protective custody *ex parte* court order.

**CLAIM III**
**Due process violation by Defendants Popma and Hood-Haly**
**for conspiracy and willful joint participation**
**with Defendants Crescenzo and Johnson**

120.    "Private persons or entities act 'under color of state law for § 1983 purposes' by 'willful participa[tion] in joint action with the State or its agents.' " *Rufo v. Fox* (3rd Cir. 2022) citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)

121.    On February 12, 2021, Defendant Johnson spoke to Defendant Popma asking CHOP to ban C.U. and A.R. from CHOP.

122.    Defendant Popma did not ask whether Defendant Johnson had a court order as CHOP social worker Thaddeus Desmond did when Defendant Crescenzo made the same request two months earlier in December.

123.    Defendant Popma did not seek advice from a superior about whether CHOP should comply with a request to ban a parent from CHOP without a court order, as CHOP social worker Thaddeus Desmond did when Defendant Crescenzo made the same request two months earlier in December.

124.    Instead of refusing Defendant Johnson's request, Defendant Popma willfully participated and jointly acted with Defendant Johnson under color of law when she called the CHOP on-call social worker, Defendant Hood-Haly, and told Defendant Hood-Haly to implement a ban on C.U. and A.R. with CHOP security.

125.    Defendant Hood-Haly did not ask whether Defendant Johnson had a court order as CHOP social worker Thaddeus Desmond did when Defendant Crescenzo made the same request two months earlier in December.

126.    Defendant Hood-Haly did not seek advice from a superior about whether CHOP should comply with a request to ban a parent from CHOP without a court order, as CHOP social worker Thaddeus Desmond did when Defendant Crescenzo made the same request two months earlier in December.

127.    Defendant Popma made Defendant Hood-Haly aware that the request to ban originated with Defendant Johnson, a Philadelphia DHS caseworker.

128.    Instead, Defendant Hood-Haly, willfully participated and jointly acted under color of law when she "implemented the restriction and distributed to unit clerk and security" as Defendants Johnson and Popma had requested.

**Relief Requested**

WHEREFORE, in light of the foregoing, Plaintiffs C.U. and A.R. request the following:

a.    a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §1983 declaring Philadelphia DHS policy and/or failure to train its employees about due process when requesting that parents be banned from the hospital where their child is being cared to be unconstitutional because it violates the Fourteenth Amendment right to due process;

b.    nominal, compensatory, and punitive damages in an amount to be proven at trial;

c.    an order awarding Plaintiffs the costs incurred in this litigation including attorneys fees pursuant to 42 U.S.C. § 1988; and

d.    such other relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury on all issues so triable.

Respectfully submitted,

/s/ Mark D. Freeman

Mark D. Freeman, Esq.
Attorney for Plaintiffs
PA Attorney ID#83763
PO Box 457
Media, PA 19063
V - 610-828-1525
F – 610-828-1769

## DECLARATION

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___7ᵗʰ___ day of ___December___, 2022



C                    U

A            R