**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **C.U. and A.R.,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 22-4950** |
| | : | |
| **CITY OF PHILADELPHIA DEPARTMENT** | : | |
| **OF HUMAN SERVICES, et al.** | : | |

**McHUGH, J.**                                                                             **May 3, 2023**

<u>**MEMORANDUM**</u>

This is a civil rights case in which the core issue is whether the 14th Amendment provides due process protection for parents seeking to visit their hospitalized child, where public officials had limited their access based upon a suspicion of abuse. Because I am persuaded that the deprivation here was long enough and substantial enough to create a protectable interest, with one limited exception, I will deny the municipal Defendants' Motion to Dismiss.

## I.     Factual Background

This case arises out of the following allegations. On December 10, 2020, Plaintiffs C.U. and A.R. brought their 5-week-old infant daughter ("C.T.R.") to Children's Hospital of Philadelphia ("CHOP") when she became unresponsive. Compl. ¶¶ 22-23. Brain imaging taken upon her arrival showed a "progressive destructive process, possibly infectious or metabolic in origin . . . not typical of a direct traumatic brain injury." *Id.* at ¶ 24. Further imaging revealed that C.T.R. was healing from acute rib fractures and a possible clavicle fracture. *Id.* at ¶ 28. Although the child was later diagnosed with Osteogenesis Imperfecta,[1] a genetic disorder that causes bones

---

[1] "Osteogenesis [I]mperfecta (OI) is an inherited (genetic) bone disorder that is present at birth. It is also known as brittle bone disease. A child born with OI may have soft bones that break (fracture) easily, bones that are not formed normally, and other problems. Signs and symptoms may range from mild to severe."

to break easily, those observing C.T.R. at the time believed that her "unexplained fractures" were suspicious and raised questions of abuse. *Id.* at ¶ 30.

The next day, Defendant Amy Crescenzo, a supervisor for the Philadelphia Department of Human Services ("DHS"), spoke with a CHOP social worker to discuss whether CHOP could restrict her parents, the Plaintiffs here, from visiting C.T.R. *Id.* at ¶¶ 35-36, 38. The Complaint includes an excerpt from C.T.R.'s medical records, which documents this conversation:

> On-call SW received call from DHS supervisor Amy Crescenzo asking if CHOP could restrict parents from visiting patient. SW asked if they had a court order/emergency custody for that? Worker explained that they did not and were not seeking custody at this time due to possible future passing of patient. SW consulted with LOC (Megan Bowers) and decision was made to not restrict at this time without court order. SW attempted to call Ms. Crescenzo back to inform her of this decision but she did not answer. Left VM asking for a return phone call.

*Id.* at ¶ 38 (cleaned up). Although hospital staff also suspected that C.T.R.'s injuries were caused by abuse, CHOP nonetheless elected to conduct a genetic panel on C.U., C.T.R.'s mother, as her personal medical history raised the possibility that she may have a bone disorder like Osteogenesis Imperfecta. *Id.* at ¶ 44. CHOP informed Plaintiffs that the results were negative for any such genetic mutation. *Id.* at ¶ 45. Plaintiffs allege, however, that CHOP's testing revealed that both C.U. and C.T.R. were positive for a lesser-known genetic mutation associated with Osteogenesis Imperfecta, which CHOP staff overlooked at the time. *Id.* at ¶¶ 46, 75-77.

Two months later, in February 2021, while still hospitalized, C.T.R. suffered a new fracture to her right femur, leading the hospital to institute "fragile bone precautions" for the remainder of C.T.R.'s care. *Id.* at ¶¶ 53-57. Plaintiffs allege that they could not have caused this fracture because it occurred while they were visiting their older child outside of the hospital. *Id.* at ¶ 48. They further allege that medical checks, including "placing a blood pressure cuff on C.T.R.'s right

---

*See* Johns Hopkins Medicine, *Osteogenesis Imperfecta* (2023), https://www.hopkinsmedicine.org/health/conditions-and-diseases/osteogenesis-imperfecta.

leg at least twice," may have been the cause of the injury.  *Id.* at ¶¶ 48-50.  Dr. Mazzeo wrote in

C.T.R.'s medical notes that when she informed Plaintiffs of the new fracture, they were "tearful"

and "distressed," and again objected that the hospital was overlooking some other explanation for

C.T.R.'s fragile bone health.  *Id.* at ¶ 54.  Moreover, the following day, a skeletal survey revealed

additional, unhealed fractures.  *Id.* at ¶ 58.  A progress note written by Defendant Laura Pompa –

a social worker on CHOP's Suspected Child Abuse and Neglect ("SCAN") team – explained:

> These fracture[s] have not been previously identified and are considered new.  At
> this time, there are no known accidents or events that would have led to these
> fractures.  Mother and Father expressed concern for CHOP staff causing patient's
> injuries due to patient being admitted at CHOP when injuries occurred.  At this
> time, a report to Child Protective Services is warranted to further reinvestigate the
> cause of [patient's] injuries.

*Id.*

That evening at 9:30pm, Defendant Pompa asked her colleague Defendant Shanik Hood-

Haly, another CHOP social worker, to restrict Plaintiffs' ability to visit and stay with their

daughter.  *Id.* at ¶ 59.  Defendant Hood-Haly made the following note in C.T.R.'s medical records:

"On-call SW received a call from SCAN SW requesting that parents (C.U. & A.R.) be restricted

from the hospital *at the request of DHS worker (Sharina Johnson)*[2] *due to ongoing investigation*.

On-call SW implemented the restriction and distributed to unit clerk and security."  *Id.* at ¶ 62

(emphasis added).  Plaintiffs learned of the ban from Defendants Johnson and Crescenzo of DHS.

*Id.* at ¶ 63.

For the next two months, C.U. and A.R. were prohibited from visiting or staying with their

daughter.  *Id.* at ¶ 65.  Plaintiffs were only allowed visitation on one occasion – the day that C.T.R.

underwent neurosurgery – during which they were constantly supervised by Ms. Crescenzo.  *Id.*

at ¶¶ 65-68.   C.T.R.'s medical records verify: "Child Protection Team SW spoke to DHS

---

[2] Sharina Johnson is a caseworker at DHS and also named as a defendant in this action.

Supervisor . . . and Ms. Crescenzo confirmed that she will come to CHOP on Wednesday (2/24/21) at 6:30AM to supervise Mother and Father throughout the day due to [patient] going to the OR for a VP shunt." *Id.* at ¶ 68 (cleaned up).

While Plaintiffs were banned from the hospital, C.T.R. sustained new fractures to her arms and legs. *Id.* at ¶ 69. Even before these new fractures occurred, however, CHOP's genetic department determined that C.U. and C.T.R. should again be tested for genetic disorders related to fragile bones, and this time employed an outside laboratory to do so. *Id.* at ¶ 64. The results came back on April 1, 2020 and confirmed that "both C.T.R. and C.U. had one copy of a genetic FKBP10 mutation associated with Osteogenesis Imperfecta." *Id.* at ¶ 73. Moreover, a genetics doctor confirmed that the initial testing CHOP performed in February showed that both C.U. and C.T.R. had this particular genetic mutation as well. *Id.* at ¶ 75.

A few weeks later, Ms. Crescenzo called CHOP to discuss how to move forward. *Id.* at ¶ 84. C.T.R.'s medical records state: "SW received a call from CYS [supervisor], Amy Crescenzo. Current plan for discharge is to train parents in preparation for discharge home with them; DHS will work on a safety plan including supervision. SW spoke with [patient's] mother to inform her that Visitation Restriction will be lifted." *Id.* (cleaned up). On May 7, 2021, C.T.R. was discharged from the hospital. *Id.* at ¶ 87. She continues to receive treatment at CHOP to manage her condition and the impacts of her neurological infection. *Id.* at ¶¶ 88-89.

## II.    Procedural Background

In their Complaint, Plaintiffs assert that Defendants violated their procedural and substantive due process rights. They outline three counts: (1) that, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), DHS either maintains a policy that allows its employees to ban parental visitation without due process and fails to train its employees that banning parents from a hospital triggers due process concerns, *id.* at ¶¶ 109-10; (2) that Defendants Crescenzo and

Johnson – the individual DHS Defendants – violated their due process rights by banning Plaintiffs from visiting or staying with their child without a reasonable basis and without procedural protections, *id.* at ¶¶ 111-19; and (3) that Defendants Pompa and Hood-Haly (collectively "the CHOP Defendants") willfully participated and jointly acted with DHS in implementing this ban that violated Plaintiffs' due process rights as parents.

Defendants Crescenzo, Johnson, and DHS have moved to dismiss Counts One and Two. ECF 13.  The CHOP Defendants filed an Answer and asserted a crossclaim against the DHS Defendants.  ECF 15.  The crossclaim summarily asserts, with no factual allegations, that the DHS Defendants were the sole and proximate cause of Plaintiffs' injuries or, alternatively, that the DHS Defendants should be held jointly liable if the CHOP Defendants are held responsible. ECF 15 at 22.  The DHS Defendants also move to dismiss the crossclaim, arguing that (1) Plaintiffs' underlying constitutional claim is not valid and (2) the CHOP Defendants failed to set forth any facts to support their claim for contribution.  ECF 18.  The CHOP Defendants have not responded to the motion.

## III.   Legal Standard

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard described in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## IV.   Discussion

### A.  Plaintiffs adequately plead state action for their § 1983 claim.

The DHS Defendants first argue that Counts One and Two should be dismissed because Plaintiffs fail to establish that a government actor made the decision to ban Plaintiffs from the hospital.  ECF 13 at 6; *see West v. Atkins*, 487 U.S. 42, 48-50 (1988).  Instead, Defendants characterize the Complaint as showing that the CHOP social work team acted alone in restricting

Plaintiffs' visitation and, because CHOP is neither a governmental actor nor controlled by DHS, any constitutional claim under § 1983 is necessarily defeated.  *Id.*

I disagree.  Plaintiffs include in their Complaint excerpts from CHOP's medical records, in which a hospital social worker wrote: "On-call SW received a call from SCAN SW requesting that parents (C.U. & A.R.) be restricted from the hospital *at the request of DHS worker (Sharina Johnson) due to ongoing investigation*."  Compl. ¶¶ 59-63 (emphasis added).  Plainly, the Complaint includes factual allegations to suggest that Defendant Johnson, in her role with DHS, requested the restriction on Plaintiffs that altered their custody arrangement.  Plaintiffs' Complaint also includes allegations that Ms. Crescenzo of DHS played a significant role in supervising Plaintiffs on the day of C.T.R.'s neurosurgery and in ultimately lifting the visitation ban, further demonstrating DHS's direct involvement in the alleged violations.  *Id.* at ¶ 68.  Plaintiffs' Complaint thus pleads adequate factual allegations to plausibly demonstrate that state actors – the DHS Defendants – were directly involved in the decision to ban Plaintiffs from the hospital.[3]

**B. Plaintiffs adequately plead the deprivation of a constitutional right.**

Defendants next argue that the conduct Plaintiffs complain of does not trigger 14th Amendment protections.  ECF 17 at 2.  Defendants note, for example, that Plaintiffs were neither deprived of the right to transfer their child's care to another hospital nor stopped from otherwise challenging the decision to ban their visitation.  *Id.*  In short, the DHS Defendants argue that Plaintiffs' claims fail under § 1983 because banning parents from visiting their child in the hospital does not result in an alteration to care, custody, or control sufficient to give rise to constitutional injury.  *Id.*

---

[3] Because the Complaint plausibly shows direct involvement of DHS, the debate in the Response and Reply Motions, ECF 16 & 17, about proximate cause and state-created danger is not relevant to my analysis.

The parties agree that parents have a 14th Amendment liberty interest in the "companionship, care, custody, and management" of their children. *McCurdy v. Dodd*, 352 F.3d 829, 827 (3d Cir. 2003) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972)). The Third Circuit has affirmed that "[t]he procedural component of parental due process rights . . . requires rigorous adherence to procedural safeguards anytime the state seeks to alter, terminate, or suspend a parent's right to the custody of [their] minor children." *Id.*; *see Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977) (explaining that "the most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state"). Indeed, as pleaded in the Complaint, the Commonwealth of Pennsylvania recognized this principle in its 2014 "Special Transmittal" to all county youth and child services offices, in which it disseminated this very language from *McCurdy* and added that alterations of parental care and custody occur any time there is "separation [] within the family," "altering of parental capacity," "interference with custody," or "interference with parental visitation." Compl. ¶¶ 18-19.

The question then is whether a ban on hospital visitation for two months is the type of deprivation that "alter[s]" a parent's right to custody, care, and companionship. *McCurdy*, 352 F.3d at 827. Although the particular facts of this case do not neatly fit within existing caselaw, I conclude that the DHS-CHOP visitation ban carried sufficiently serious custodial implications to give rise to 14th Amendment concerns, especially given the length of time for which the ban persisted. Related caselaw from this Circuit supports such a result. For example, in *Smith v. St. Luke's Hosp. Univ. Healthcare Network Anderson Campus*, No. 22-1478, 2023 WL 1767478, at *2, *9 (E.D. Pa. Feb. 23, 2023), the plaintiffs were parents barred from visiting with and taking their infant home from the hospital for three days when the hospital believed the mother had tested positive for methadone. Judge Baylson found that the hospital's ban would have triggered the 14th

Amendment and required a post-deprivation hearing had the ban lasted more than 72 hours, far less than occurred here. *Id.* at *9. *Smith* may appear distinguishable on the basis that the hospital there prohibited the parents from taking their child home, which did not occur in this case. But any such distinction loses force on the facts here, where the child's condition was so serious that DHS did not seek a court order taking custody because C.T.R. could imminently die. *Id.* at *2; Compl. ¶ 38. No parent in that situation could be expected to remove their infant child from the hospital's care, rendering any ban on discharge superfluous. Practically speaking, the parents had no choice but to leave their child in CHOP's care, so a ban on visitation was in real-life terms an absolute barrier between the parents and their child.

Other courts have also concluded that similar barriers between parents and child trigger due process concerns. In *Starkey v. York County*, No. 1:11-cv-981, 2012 WL 9509712, at *2-3 (M.D. Pa. Dec. 20, 2012), the plaintiffs were parents who were required to sign two "voluntary" safety plans after a hospital medical team suspected physical abuse of a patient child. The first safety plan prohibited the parents from unsupervised contact with either of their minor children, including the child who was hospitalized; the second safety plan prohibited unsupervised contact and further disallowed Plaintiffs from residing in their family home with their children following discharge. *Id.* The question of whether imposition of these safety plans violated Plaintiffs' due process rights arose in the context of qualified immunity. As to procedural due process, the court held that there is a clearly established right to due process protections when a safety plan implicates a parent's right to the care, custody, and management of a child – particularly where a parent or child is removed from a home – and that the plaintiffs' rights were violated when they were not offered any procedural protections before or after signing the safety plan. *Id.* at *9-12. As to substantive due process, the court ruled against the Plaintiffs on the merits, but with respect to the

threshold issue relevant to my analysis here, held that Plaintiffs properly identified a clearly established federal right to be free from unreasonable and unsupported child abuse investigations. *Id.* at \*6-8; *see also Maddox v. Ga. Dep't of Hum. Servs., Div. of Fam. & Child. Servs.*, No. 1:10-CV-02742-AT, 2012 WL 12893269, at \*20 (N.D. Ga. Sept. 28, 2012) (finding that a "safety plan" for an infant child that discharged child from the hospital to a different caretaker and prevented the mother from taking physical custody triggered a potential due process violation).

Although the parents in *Starkey* were removed from their home, creating an even more severe deprivation of constitutional rights, the general custodial arrangement was, in its practical effect, the same as here: in both cases, even though child welfare authorities did not formally take custody of the children who were suspected to be victims of abuse, the parents were forbidden from unsupervised contact with their children for months.  *See Starkey*, 2012 WL 9509712, at \*2-3 (explaining that the minor children were permitted to stay in their home with a relative pending the abuse investigation).  Conditions that so impact a parent's typical custodial arrangement, including when a parent can or cannot see their child, implicate that parent's right to due process. *See McCurdy*, 352 F.3d at 827 (stating that constitutional violations occur when the liberty interest of "decision making regarding the care, custody, and control of minor children" is deliberately impacted).  Given this precedent, and the circumstances here, I am persuaded that a long-term ban on hospital visitation triggers due process concerns.  The claims against the individual municipal defendants may therefore proceed.

**C.  Plaintiffs adequately plead a *Monell* claim on a failure-to-train theory but fail as to their municipal-policy theory.**

A municipality "may be held liable for the violation of a constitutional right under 42 U.S.C. § 1983 only when the alleged unconstitutional action executes or implements policy or a decision officially adopted or promulgated by those whose acts may fairly be said to represent

official policy." *Reitz v. County of Bucks,* 125 F.3d 139, 144 (3d Cir. 1997) (citing *Monell*, 436 U.S. at 690-91).   Alternatively, "in the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under § 1983 . . . only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" *Id.* at 145 (cleaned up).   Deliberate indifference in the context of a failure-to-train claim requires that a plaintiff show three things: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

To establish their *Monell* claim, Plaintiffs rely on the "Special Transmittal" from the Commonwealth instructing all county youth services agencies that procedural due process requires "rigorous adherence to procedural safeguards anytime the state seeks to alter, terminate, or suspend a parent's right to the care, custody and management" of a child.  Compl. ¶ 18.  Plaintiffs also state that Defendant DHS "delegated its duty to train its caseworkers, supervisors and administrators to the University of Pittsburgh's Pennsylvania Child Welfare Training Program," and that a review of those training materials "demonstrates that it is devoid of training that banning parents from visiting/staying with their child in the hospital alters the parents' right to fundamental care, custody and control of their child, and triggers due process considerations."  *Id.* at ¶¶ 98-103.  Plaintiffs proceed to argue that, based on the conduct of Defendants in their case, DHS must either (1) have a policy that allows DHS employees to alter custody arrangements without due process and without obtaining a court order, and/or (2) fail to adequately train its employees that any step to

alter, terminate, or suspend a parent's right to care triggers due process concerns.  *Id.* at ¶ 109.  In response, Defendants argue that Plaintiffs have not adequately pled either type of claim.

I agree that Plaintiffs have failed to state a claim based upon a constitutionally deficient policy, because they have not alleged conduct by a municipal decisionmaker.  *See McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (2009) (explaining that claims are dismissed when plaintiffs "fail to allege conduct by a municipal decisionmaker"); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *Ross v. Project H.O.M.E.*, No. 13-751, 2014 WL 2464962, at *3 (E.D. Pa. June 2, 2014) (Quiñones Alejandro, J.).

As to a failure-to-train claim, Defendants put forth two arguments in favor of dismissal. First, Defendants argue that Plaintiffs' claim fails because they do not plead a "pattern of unconstitutional conduct by untrained employees." ECF 13 at 11.  But every *Monell* claim need not be based upon a pattern of unconstitutional conduct.  In some circumstances, a single incident can give rise to a failure to train violation.  *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).  "In order to avoid collapse into *respondeat superior*," plaintiffs alleging a single injury must show "that the need for the county to provide specific training in order to avoid constitutional injury was highly predictable or patently obvious."  *Dennis v. DeJong*, 867 F. Supp. 2d 588, 656 (E.D. Pa. 2011) (quoting *Connick*, 563 U.S. at 61-71) (cleaned up); *see Connick*, 563 U.S. at 63-64 (positing that a single-incident failure-to-train claim would succeed if a city "arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training," because the need to instruct the officers on the constitutional limitation on using deadly force would be "patently obvious"); *Kane v. Chester Cnty. Dep't. of Child., Youth, and Families*, 10 F. Supp. 3d 671, 689-90 (E.D. Pa. 2014) (denying a motion to dismiss on a failure-to-train, single-violation *Monell* claim because "occasions for caseworkers to deal with instances of sexual

conduct are likely to recur in the course of caseworkers' duties, perhaps even with sufficient frequency to create a need for county to provide specific training"). Occasions where caseworkers deal with instances of suspected abuse of children in hospitals are highly likely to recur,[4] making the need for training on this topic to avoid injury "highly predictable" and "patently obvious." *See Dennis*, 867 F. Supp. 2d at 656. The lack of a pattern is therefore not fatal to Plaintiffs' claim.

Defendants' second argument is that the training topic identified by Plaintiffs is "illogical" because there is nothing for a policy to address when Plaintiffs cannot claim a constitutional injury. ECF 13 at 11. Specifically, Defendants contend that "it would defy logic to hold DHS liable for failing to train its employees" on the impact that hospital bans have on parents' rights because the topic is "not appropriately supported by law." *Id.* As stated above, I rejected that view. And, because I have found that Plaintiffs do state a colorable constitutional violation at this stage of litigation, Defendants' concession that it does not train its employees on this topic undermines its own position. *See Starkey*, 2012 WL 9509712, at *13-14 (stating that such a concession "in and of itself ostensibly supports *Monell* liability"); *Isbell*, 962 F. Supp. 2d at 754-57 (same). Where there is no training whatsoever designed to protect a constitutional right, "the reasonable inference is that any training . . . would have alleviated or reduced to nothing the likelihood of a constitutional deprivation." *Isbell*, 962 F. Supp. 2d at 756 (citations omitted). I therefore conclude that Plaintiffs' *Monell* claim survives dismissal.

---

[4] *See, e.g.*, *Dennis*, 867 F. Supp. 2d at 578-80 (medical team involved child services after suspecting parent was abusing child); *Starkey*, 2012 WL 9509712, at *2-4 (same); *Isbell v. Bellino*, 962 F. Supp. 2d 738, 741 (M.D. Pa. 2013) (same); *Gajarov v. Allegheny Cnty. Off. of Child., Youth, & Families*, No. 20-1017, 2021 WL 140842, at *1 (W.D. Pa. Jan. 15, 2021) (same); *A.L. v. Eichman*, 376 F. Supp. 3d 547, 550-54 (W.D. Pa. 2019); *see also Costobile-Fulginiti v. City of Philadelphia*, 719 F. Supp. 2d 521, 523 (E.D. Pa. 2010) (medical team involved child services after parent tested positive for drugs); *Harrington v. UPMC*, No. 20-497, 2022 WL 1606422, at *8 (W.D. Pa. May 20, 2022) (same); *Bower v. Lawrence Cnty. Child. and Youth Servs.*, 964 F. Supp. 2d 475 (W.D. Pa. 2013) (same); *Smith*, 2023 WL 1767478, at *1-2 (same).

**D. CHOP Defendants fail to establish sufficient factual allegations for their contribution crossclaim.**

Lastly, I will address the municipal Defendants' Motion to Dismiss CHOP's crossclaim asserting contribution.[5]  The DHS Defendants' first argument mirrors those discussed above – that Plaintiffs' underlying constitutional claim is not valid.  Because I have already decided that Plaintiffs set forth a viable constitutional claim to survive dismissal, that argument provides no basis for ruling in their favor.

The DHS Defendants present a more substantial argument regarding the sufficiency of the CHOP's pleading.  The crossclaim asserts as follows:

> Should it be determined at trial that Answering Defendants is in any way liable to Plaintiffs, which is denied, then Answering Defendants assert that Municipal Defendants are liable over to or with Answering Defendants on any cause of action arising out of the transaction or occurrences upon which the underlining cause of action is based. Answering Defendants further assert their right of contribution and/or indemnity against Municipal Defendants.
>
> If it is determined at any time during trial that Answering Defendants are in any way liable to Plaintiffs, which liability is specifically denied, then Answering Defendant assert that Municipal Defendants are jointly and severally liable to Answering Defendants on any cause of action arising out of the transactions or occurrences upon which the underlying causes of action are based.

ECF 15 at ¶¶ 4-5.  In the context of common law claims for negligence, conclusory pleading like this is commonplace and generally not challenged.  That is the case because the same legal principles apply equally to all the parties and the essential question is their percentage of responsibility.  Here, however, some of the defendants are state actors and some private parties.  As such, the controlling legal principles do not necessarily apply equally.  In fact, the basis for the crossclaims may depend upon the nature of the municipal defendants.  For example, one can

---

[5] The DHS Defendants' motion to dismiss the crossclaim only addresses the CHOP Defendants' crossclaim for contribution and does not address the claims for joint and several liability or indemnity.  My findings and reasoning thus only impact the CHOP Defendants' claim for contribution.

conceive that the CHOP Defendants might argue that they were obligated to comply with the requests of child welfare authorities or, alternatively, even if not legally obligated, that they were reasonable for doing so.  Given the unusual factual circumstances of this case, I agree with the municipal Defendants that the factual basis for the crossclaims is important, and an understanding of the factual basis may be important in their shaping a defense.  I will therefore dismiss the crossclaims for lack of specificity, without prejudice to amendment.

## V.      Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss the Complaint will be granted in part and denied in part.  Defendants' Motion to Dismiss the Crossclaim will be granted, without prejudice, as to the issue of contribution.  An appropriate order follows.


    /s/ Gerald Austin McHugh
United States District Judge